**Slip Op. 23-32**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SHAMROCK BUILDING MATERIALS, INC.,** | |
| Plaintiff, | **Before: Timothy C. Stanceu, Judge** |
| v. | **Court No. 20-00074** |
| **UNITED STATES,** | |
| Defendant. | |

## OPINION

[Granting defendant's cross-motion for summary judgment on the tariff classifications of certain steel electrical conduit tubing]

Dated: March 13, 2023

*Patrick D. Gill*, Sandler Travis & Rosenberg, P.A., of New York, N.Y., argued for plaintiff.  With him on the briefs was *Michael S. O'Rourke*.

*R. Will Planert*, Morris Manning & Martin, LLP, of Washington, D.C., for plaintiff. With him on the briefs were *Nicholas C. Duffey*, *Donald B. Cameron*, *Julie C. Mendoza*, *Brady W. Mills*, *Mary S. Hodgins*, *Eugene Degnan*, *Edward J. Thomas III*, and *Jordan L. Fleischer*.

*Marcella Powell*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., argued for defendant.  With her on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Justin R. Miller*, Attorney-In-Charge.  Of counsel on the briefs was *Mathias Rabinovitch*, Office of the Assistant Chief Counsel for International Trade Litigation, U.S. Customs and Border Protection.

Stanceu, Judge: Plaintiff Shamrock Building Materials, Inc. ("Shamrock")

brought this action to contest the denial of its administrative protests by U.S. Customs

and Border Protection ("Customs" or "CBP").  Compl. ¶ 1 (May 20, 2020), ECF No. 10

("Compl.").  Shamrock claims that Customs incorrectly determined the tariff

classifications of certain imported steel electrical conduit tubing.  *Id.* ¶ 8.  Before the

court are the parties' cross-motions for summary judgment.  The court awards

summary judgment in favor of defendant United States.

## I. BACKGROUND

This case arose over the tariff classification of steel conduit tubing ("conduit")

that plaintiff imported from Mexico.  *Id*.  Shamrock was the importer of record for 201

entries of conduit at the Port of Laredo, Texas between June and October of 2018, which

Customs liquidated between April and July of 2019.  Summons 3–6 (Apr. 6, 2020), ECF

No. 1 ("Summons"); Compl. ¶ 47.  Following liquidation, Shamrock timely filed

protests of CBP's determinations of classification between June and August of 2019,

which CBP denied on November 7 and December 9, 2019.  Summons 3–6; Compl.

¶¶ 1, 6.  Shamrock initiated the instant action to contest the denial of its protests with a

timely filing of its summons on April 6, 2020 and filed its complaint on May 20, 2020.

Before the court are plaintiff's and defendant's motions for summary judgment.

Pl.'s Mot. for Summary J. (June 3, 2022), ECF No. 43; Mem. in Supp. of Pl.'s Mot. for

Summary J. (June 3, 2022), ECF No. 43 ("Pl.'s Br."); Def.'s Cross-Mot. for Summary J.

(Aug. 11, 2022), ECF No. 48; Mem. of Law in Resp. to Pl.'s Mot. for Summary J. and in Supp. of the Government's Cross-Mot. for Summary J. (Aug. 11, 2022), ECF Nos. 48 (original), 64 (corrected) ("Def.'s Br.");[1] Pl.'s Resp. to Def.'s Cross-Mot. for Summary J. (Sept. 29, 2022), ECF No. 55; Mem. of Law in Reply to Pl.'s Resp. to the Government's Cross-Mot. for Summary J. (Nov. 10, 2022), ECF No. 61.

Also before the court is a motion in limine plaintiff filed on April 11, 2022, prior to the filing of the summary judgment motions, seeking a ruling that portions of the report of defendant's designated expert witness would be inadmissible at trial. Mot. in Limine, ECF No. 41 ("Mot. in Limine").

Following briefing on the motion and cross-motion for summary judgment, plaintiff and defendant jointly moved for oral argument. Joint Mot. for Oral Argument (Nov. 17, 2022), ECF No. 65. The court held oral argument on Thursday, February 23, 2023.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction over this action pursuant to Section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(a), which grants the court "exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or

---

[1] References to the Defendant's Brief are to the original version (ECF No. 48), as the corrected version (ECF No. 64) addressed only a single error concerning a quoted figure from an identified expert witness.

in part, under section 515" of the Tariff Act of 1930 ("Tariff Act"), *as amended* 19 U.S.C § 1515.[2]  Actions to contest the denial of a protest are adjudicated by the court *de novo*. 28 U.S.C. § 2640(a)(1) ("The Court of International Trade shall make its determinations upon the basis of the record made before the court.").

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT R. 56(a).  In a tariff classification dispute, summary judgment is appropriate where "there is no genuine dispute as to the nature of the merchandise and the classification determination turns on the proper meaning and scope of the relevant tariff provisions."  *Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1371 (Fed. Cir. 2013) (citations omitted).

## B.  Description of the Merchandise

The facts stated in this Opinion to describe the conduit are taken from the submissions of the parties and, unless stated otherwise herein, are not in dispute.[3]

---

[2] References to the United States Code and to the Harmonized Tariff Schedule of the United States ("HTSUS") herein are to the 2018 editions.

[3] *See* Pl.'s Statement of Undisputed Material Facts (June 3, 2022), ECF No. 43; Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts (Aug. 11, 2022), ECF No. 48-1; Def.'s Statement of Undisputed Material Facts (Aug. 11, 2022), ECF Nos. 48-2 (original), 64-1 (corrected); Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts (Sept. 29, 2022), ECF No. 55-1; Mem. of Law in Resp. to Pl.'s Mot. for Summary J. and in Supp. of the Government's Cross-Mot. for Summary J. Exs. 6, 14 (Aug. 11, 2022), ECF (continued…)

The imported conduit was produced in Mexico by Conduit S.A. de C.V., dba RYMCO. The parties describe the conduit as being of two types, "electrical metal tubing" ("EMT") and "intermediate metal conduit" ("IMC"). Both are made of carbon steel with welded seams, are of circular cross section, are galvanized with a layer of zinc on the outer surface, are produced in ten-foot lengths, in various diameters, and are threaded at the ends. EMT and IMC are highly similar, differing with respect to wall thickness in that IMC is produced to relatively larger wall thicknesses than is EMT.

The conduit is used to form a "raceway" for the routing of electrical wiring from one location to another while protecting the wires within from external forces. It is suitable for use in routing and protecting wiring circuits (e.g., 110-volt circuits) in household and commercial applications. Individual lengths of conduit can be connected by threaded steel couplings.

Significant to the classification issue presented by this case, which involves the insulating characteristics of the imported merchandise, is a layer of organic epoxy coating (also referred to as "enamel") on the interior surface of the conduit. The interior coating is comprised of epoxy resin, melamine resin, and silicone additives, among other materials, the precise composition of which is proprietary to the supplier of the

---

Nos. 48 (original), 64 (corrected); Oral Argument at 0:06:07 (discussing the difference between EMT and IMC); *id*. at 2:10:00, 2:14:30, & 2:16:26 (confirming with the parties a set of undisputed facts); *id*. at 2:12:36 & 2:18:59 (discussing the measured thickness of the coating on the inside of the conduit).

epoxy coating, Pinturas Diamex S.A.  The coating is transparent, allowing the steel

surface of the inside of the conduit to be visible.  The coating varies in thickness and

was measured to be between 10 and 60 microns, inclusive.[4]

The interior coating protects wires from abrasion as they are pulled through the

conduit.  Epoxy, melamine, and silicone have electrically-insulating properties.  The

parties are unaware of any customers who purchased the conduit from Shamrock

specifically "because the interior coating provides electrical insulation."

## C.  Tariff Classification under the HTSUS

Tariff classification under the Harmonized Tariff Schedule of the United States

("HTSUS") is governed by the General Rules of Interpretation ("GRIs") and, if

applicable, the Additional U.S. Rules of Interpretation ("ARIs"), both of which are

contained in the statutory text of the HTSUS.  *Dependable Packaging Solutions, Inc. v.*

*United States*, 757 F.3d 1374, 1377 (Fed. Cir. 2014) (citation omitted) ("Along with the

headings and subheadings . . . the HTSUS statute also contains the 'General Notes,' the

'General Rules of Interpretation' ('GRI'), the 'Additional United States Rules of

Interpretation' ('ARI'), and various appendices for particular categories of goods.").

The GRIs are applied in numerical order, with GRI 1 providing that

"classification shall be determined according to the terms of the headings and any

---

[4] One micron is equal to one one-thousandth of a millimeter.

relative Section or Chapter Notes." GRI 1, HTSUS. GRIs 2 through 6 apply "provided such headings or notes do not otherwise require." *Id.*

After determining the correct four-digit heading, the court determines the correct subheading by applying GRI 6, HTSUS (directing determination of the subheading "according to the terms of those subheadings and any related subheading notes and, mutatis mutandis, to the above rules" [GRIs 1 through 6]).

### D.  Judicial Review in Tariff Classification Disputes

In adjudicating a tariff classification dispute, the court first considers whether "the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984) ("*Jarvis Clark*"). The plaintiff has the burden of showing that the government's classification of the subject merchandise was incorrect. *Id.* at 876. Subject to the plaintiff's rebuttal, factual determinations by Customs are presumed correct, *see* 28 U.S.C. § 2639(a)(1), but the presumption of correctness applies to issues of fact and not questions of law, *Goodman Mfg. L.P. v. United States*, 69 F.3d 505, 508 (Fed. Cir. 1995). If the plaintiff satisfies its burden of demonstrating that the government's classification was incorrect, the court must ascertain "the *correct* result, by whatever procedure is best suited to the case at hand." *Jarvis Clark*, 733 F.2d at 878 (footnote omitted).

In determining the correct classification, the court undertakes a two-step analysis. *Faus Grp., Inc. v. United States*, 581 F.3d 1369, 1371 (Fed. Cir. 2009). "The first

step addresses the proper meaning of the relevant tariff provisions, which is a question

of law." *Id.* (citation omitted). "The second step involves determining whether the

merchandise at issue falls within a particular tariff provision as construed, which, when

disputed, is a question of fact." *Id*. at 1371–72 (citation omitted).

"Absent contrary legislative intent, HTSUS terms are to be construed according

to their common and commercial meanings." *La Crosse Tech., Ltd. v. United States*, 723

F.3d 1353, 1358 (Fed. Cir. 2013) (quoting *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375,

1379 (Fed. Cir. 1999)). When interpreting tariff terms in the HTSUS, the court "may

consult lexicographic and scientific authorities, dictionaries, and other reliable

information sources." *Carl Zeiss*, 195 F.3d at 1379 (citing *Baxter Healthcare Corp. of P.R. v.

United States*, 182 F.3d 1333, 1337 (Fed. Cir. 1999)).

The court also consults the Explanatory Notes ("ENs") for the Harmonized

Commodity Description and Coding System ("Harmonized System" or "HS")

maintained by the World Customs Organization. Although not legally binding, the

Explanatory Notes "are generally indicative of the proper interpretation of a tariff

provision." *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007) (citing

*Motorola, Inc. v. United States*, 436 F.3d 1357, 1361 (Fed. Cir. 2006)). The HTSUS is

organized according to Harmonized System rules and nomenclature (pursuant to the

"Harmonized System Convention"). The Explanatory Notes are informative as to the

intent of the drafters of the Harmonized System where, as in this case, the dispute

involves a legal determination of the scope of the competing headings as determined under the GRIs and the section and chapter notes.

### E.  Claims of the Parties

Upon liquidation of the entries, Customs classified the imported merchandise under heading 7306, HTSUS, in subheadings according to the wall thickness of the conduit, as follows:

> Subheading 7306.30.1000, HTSUS ("Other tubes, pipes, and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel: Other, welded, of circular cross section, of iron or nonalloy steel: Having a wall thickness of less than 1.65 mm")

> Subheading 7306.30.5028, HTSUS ("Other tubes, pipes, and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel: Other, welded, of circular cross section, of iron or nonalloy steel: . . . Having a wall thickness of 1.65 mm or more: . . . Other: . . . Other: With an outside diameter not exceeding 114.3 mm: Galvanized: . . . Internally coated or lined with a non-electrically insulating material, suitable for use as electrical conduit").

Goods entered in 2018 that were classified in subheadings 7306.30.10 and 7306.30.50, HTSUS were free of general (Column 1) duty, but the entries at issue were subject to a duty of 25% *ad valorem* under U.S. note 16 to subchapter III of chapter 99 and subheading 9903.80.01, HTSUS.  These provisions implemented Presidential Proclamation 9705, *Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625 (Exec. Off. of the President Mar. 15, 2018), issued under Section 232 of the Trade Expansion Act of 1962, *as amended*, 19 U.S.C. § 1862.  Proclamation 9705 was in effect and applied to products of Mexico during the dates of the entries in this action.

*Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11,625; Presidential

Proclamation 9740, *Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 20,683

(Exec. Off. of the President May 7, 2018); Presidential Proclamation 9894, *Adjusting*

*Imports of Steel Into the United States*, 84 Fed. Reg. 23,987 (Exec. Off. of the President May

23, 2019).

Plaintiff claims classification in subheading 8547.90.0020, HTSUS (". . . electrical

conduit tubing and joints therefor, of base metal lined with insulating material: . . .

Other: . . . Electrical conduit tubing and joints therefor, of base metal lined with

insulating material: Conduit tubing").  Summons 2; Compl. ¶ 33.  Goods so classified

were subject to general (Column 1) duty of 4.6% *ad valorem*, with duty-free treatment

applying to goods qualifying for preferential duty treatment under the North American

Free Trade Agreement Implementation Act.  *See* Gen. Note 12, HTSUS.

Defendant claims that the tariff classifications determined by Customs upon

liquidation are correct.  Def.'s Br. 1.

**F.  Application of GRI 1, HTSUS, to Determine the Appropriate Heading**

As required by GRI 1, HTSUS, the court first considers the terms of the headings

and any relative section and chapter notes in ascertaining the correct four-digit heading

for the classification of the imported conduit.

The candidate headings of the HTSUS identified by the parties, with the

respective article descriptions (in pertinent part), are as follows:

Heading 7306, HTSUS:      "Other tubes, pipes, and hollow profiles (for example, open seamed or welded, riveted or similarly closed), of iron or steel"

Heading 8547, HTSUS:      ". . . electrical conduit tubing and joints therefor, of base metal lined with insulating material"

The parties have not provided, and the court has not identified, any other candidate headings.

Heading 7306 is within section XV of the HTSUS while heading 8547 is within section XVI. According to note 1(f) to section XV, HTSUS section XV "does not cover: . . . Articles of section XVI (machinery, mechanical appliances and *electrical goods*)" (emphasis added). Therefore, the court first considers whether the conduit is within the scope of heading 8547, and if it is, heading 7306, although including welded carbon steel tubing of circular cross section, must be eliminated from consideration by operation of GRI 1.

The term within the article description for heading 8547, HTSUS pertinent to this dispute is "electrical conduit tubing . . . of base metal lined with insulating material." The undisputed facts are that the imported conduit at issue is "electrical conduit tubing" and that it is made of base metal (steel). The issue, then, is whether the conduit is "electrical conduit tubing . . . of base metal *lined with insulating material*," heading 8547, HTSUS (emphasis added), within the meaning of that term as it appears in the article description for the heading.

The parties disagree on the meaning of "insulating." Plaintiff reads the heading term broadly, arguing that "[t]he term 'insulate' refers to the connotation of providing a protective layer between an underlying article and something harmful." Pl.'s Br. 19 (citing various dictionary definitions). This would include, in plaintiff's view, the protection of wire from damage as it is pulled through the conduit during the installation process. In that regard, an advertising brochure describing the EMT refers to the inside surface of the conduit in stating: "Smooth interior coating insulates wall to provide easy installation of wire." Def.'s Br. Ex. 6. The brochure makes no other reference to insulation and does not advertise the interior coating as providing insulation from electrical current.

Defendant argues that the term "insulating," when read in context, must be interpreted "within the context of electrical equipment." Def.'s Br. 14. Under defendant's view, "insulating" should be read to mean "[t]o cut off or isolate from conducting bodies by the interposition of non-conductors, so as to prevent the passage of electricity or heat." Id. (quoting the Oxford English Dictionary).

The parties also disagree on the interpretation of the heading term, "electrical conduit tubing . . . of base metal lined with insulating material," considered on the whole. Taking a "plain meaning" approach, and arguing that the heading term is unambiguous, plaintiff interprets the term to be satisfied so long as the conduit is coated on the interior surface with a substance that has general application as an

insulator, regardless of the thickness, or degree of insulating performance, of the coating on the particular conduit at issue. Plaintiff argues that heading 8547, HTSUS is appropriate because "[t]he subject conduit is lined with epoxy resin, melamine and silicone. Those materials are universally recognized in scientific, technical, and lexicographic authorities as insulating materials, and, in particular, electrically insulating materials." Pl.'s Br. 9.

Defendant's interpretation, in contrast, is that the mere presence of a material that is regarded as an insulator in some applications does not suffice for classification under heading 8547, HTSUS unless the interior coating imparts, in the context of electrical equipment and the intended use, an insulating characteristic to the conduit to which it is applied. For the reasons discussed below, the court agrees.

Contrary to plaintiff's argument, the court does not view the phrase "electrical conduit tubing . . . of base metal lined with insulating material" as free of ambiguity. The merchandise at issue here presents the very question that makes the heading term ambiguous. That question involves the function of the lining material in relation to the intended purpose and use of the conduit to which it is applied: must the lining effectively "insulate" the wire (or wires), once installed, from the inner surface of the steel conduit, or is it sufficient that it perform some other function?

The Explanatory Notes to Harmonized System headings 73.06 and 85.47 provide an answer to this question. They draw a distinction between electrical conduit tubing

that is "insulated" and electrical conduit tubing that is "uninsulated." EN 73.06 instructs that excluded from HS heading 73.06 is "[i]nsulated electrical conduit tubing (heading 85.47)." In a parallel reference, EN 85.47 states that uninsulated electrical conduit tubing is excluded from HS heading 85.47 and instead is to be classified within section XV of the HS nomenclature. EN 85.47(B) ("This group covers the metal tubing used in permanent electrical installations (e.g. house wiring) as insulation and protection for the wires, **provided it has an interior lining of insulating material**. Uninsulated metal tubing, often used for the same purpose, is excluded (Section XV)."). In this way, the two Explanatory Notes draw a distinction between two classes of goods, i.e., insulated and uninsulated electrical conduit tubing.

The materials the parties have provided in support of their respective summary judgment motions do not describe the subject conduit, when offered for sale in commerce, as "insulated electrical conduit" or "insulated electrical conduit tubing." Moreover, the uncontested facts are inconsistent with a finding that the coating "insulates" the interior wire so as to impede the transfer of electrical current or heat when the conduit is used for its intended purpose. The parties agree that the coating inside the subject conduit provides some measurable resistance (or "resistivity") to the flow of electric current when compared to the same pipe when uncoated, and the evidence they would introduce demonstrates that fact. Nevertheless, the uncontested facts also demonstrate that the degree of resistivity is not significant in relation to the

intended use of the conduit. They agree, based on the statements of prospective witnesses, that while the coating provides some electrical resistivity, it does not do so in a way that would qualify the conduit as an insulator. *See* Oral Argument at 2:14:30.

Plaintiff's witness measured the resistivity of the coating inside the conduit to be between 120 milliohms and 1.2 ohms, depending on the testing method, and defendant's witness measured the resistivity as much less than that.[5] Even if the results obtained by plaintiff's witness, rather than defendant's, are taken as definitive, they would not demonstrate that the conduit significantly would impede the flow of electrical current in the type of wiring circuits that would be found in or around residential or commercial buildings. Nor could it plausibly be contended that the coating, which is extremely thin (10 to 60 microns), provides meaningful protection from overheated wiring in such circuits.

Notably, plaintiff does not contend that the coating provides significant protection from current flow or heat, and the brochure described above, Def.'s Br. Ex. 6,

---

[5] Using a two-point test, plaintiff's witness measured 0.2 ohms of resistivity on uncoated pipe and between 0.7 and 1.2 ohms of resistivity on the coated pipe. Mem. in Supp. of Pl.'s Mot. for Summary J. Ex. IV, at 128 (June 3, 2022) (Deposition of Dr. Joshua E. Jackson), ECF No. 43. Using a four-point test, plaintiff's witness measured the resistivity of the uncoated pipe to be 2.5 milliohms and the coated pipe to be 120 milliohms. *Id.* at 129. Defendant's witness measured the resistivity of the lining to be between 3.419 and 14.043 milliohms. Mem. of Law in Resp. to Pl.'s Mot. for Summary J. and in Supp. of the Government's Cross-Mot. for Summary J. 27 (Aug. 11, 2022), ECF No. 48 ("Def.'s Br.") (citing Expert Witness Report of Dr. Sakis [Athanasios] Meliopoulos (Oct. 20, 2021), Def.'s Br. Ex. 5, at 21).

does not make any such claims. According to plaintiff's theory of this case, however, that does not matter: all that is needed is a coating with a substance that has general applications as an insulator.

The court interprets heading 8547, HTSUS in a common and commercial context to describe electrical conduit that performs an insulating function necessary or desirable for electrical wiring in applications for which the conduit is designed and for which it is marketed in commerce. "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings." *La Crosse Tech.*, 723 F.3d at 1358 (quoting *Carl Zeiss, Inc.*, 195 F.3d at 1379). A reading of the word "insulating" in conjunction with the term "*electrical* conduit," in a common and commercial sense, indicates that the insulating layer must function in a way that relates to the "electrical conduit" function, i.e., it must impede electrical current or isolate the heat from the wire from the inside surface of the steel conduit. The court is not convinced that the term "electrical conduit . . . of base metal lined with an insulating material" describes electrical conduit that cannot insulate the base metal, to any significant degree, from the current or heat in the wire it surrounds.

The Explanatory Note for HS heading 85.47 provides additional insight, stating as follows:

> The tubing of this group consists either of spiralled metal strip wound on to an interior tube of insulating material, or of rigid metal tubing (usually iron or steel) coated or lined on the inside with insulating material. *The insulating material may be special electrically insulating varnish,*

*paper or paperboard, rubber, plastics, etc. Metal tubing simply coated with*
*varnish to prevent corrosion is excluded* (Section XV).

EN 85.47(B) (emphasis added). The EN describes examples of various materials that are

electrically insulating and may be used to line the conduit. While the term "may be" is

somewhat imprecise, the connotation is of a non-exhaustive list of electrically-insulating

materials that may be used as lining for the conduit. Moreover, plaintiff's broader

reading of the term "insulate" as having a "connotation of providing a protective layer

between an underlying article and something harmful," Pl.'s Br. 19, is at odds with the

example of a coating of varnish that is applied merely to protect the metal from

corrosion by insulating it from exposure to oxygen in the air. The distinction drawn by

EN 85.47 indicates that electrical conduit that is not identified in commerce as insulated

conduit, even though advertised as having a coating that smooths the interior surface to

facilitate the pulling of wire through the conduit, is not properly classified under the

heading.

In summary, the uncontested facts show that the conduit is not of a type that

could insulate the base metal, to any significant degree, from the electrical current or

heat in the wire it surrounds. Therefore, these facts demonstrate that the subject

merchandise is not "electrical conduit . . . of base metal lined with an insulating

material" within the meaning of that term as used in the article description for heading

8547, HTSUS. The subject merchandise is instead described by the terms of heading

7306 ("Other tubes, pipes, and hollow profiles . . . of iron or steel").[6]

### G. Application of GRI 6, HTSUS to Determine the Correct Subheading

Within heading 7306, HTSUS, six-digit subheading 7306.30, HTSUS includes

welded steel pipe and tube of circular cross section other than goods suitable for use in

oil or gas pipelines or for use in drilling for oil and gas. This subheading describes the

imported conduit.

Within the six-digit subheading, eight-digit subheading 7306.30.10, HTSUS

includes welded steel pipe and tube of circular cross section "[h]aving a wall thickness

of less than 1.65 mm" while subheading 7306.30.50 ("Other . . .") includes welded steel

pipe and tube of circular cross section "[h]aving a wall thickness of 1.65 mm or more."

The subject merchandise falls within these two eight-digit subheadings, depending on

the wall thickness of the individual product.[7]

---

[6] The term "Other . . ." refers to steel pipe and tube not described in the immediately preceding headings of chapter 73, HTSUS. Heading 7304, HTSUS applies to seamless steel tubes and pipes, and heading 7305, HTSUS applies to steel tubes and pipes of circular cross section, other than seamless tubes and pipes, that are of an external diameter exceeding 406.4 millimeters.

[7] Both eight-digit subheadings are free of general (column 1) duty but at the time of importation were subject to the duty of 25% *ad valorem* under U.S. note 16 to subchapter III of chapter 99 and subheading 9903.80.01, HTSUS. The ten-digit statistical subheadings are of no significance to the tariff treatment.

## H.  Plaintiff's Motion in Limine

Plaintiff argues that defendant's designated expert witness, Dr. Athanasios Meliopoulos, an electrical engineer, does not have the necessary professional qualifications to testify in the field of chemistry as an expert on what constitutes an "insulating material."  Mot. in. Limine 3 ("We submit that Dr. Meliopoulos is woefully incompetent to render an opinion on the chemical composition of the lining and whether it is insulating material.").  The expert witness report of Dr. Meliopoulos opines that the material used to coat the inside of the subject conduit would be classified as a "semiconductor" rather than as an insulator.  Def.'s Br. Ex. 5, at 8 ("[T]he coating material is a semiconductor.").  Plaintiff moves that the court order "that the opinion testimony of Dr. Athanasios Meliopoulos on what constitutes 'insulating materials' is inadmissible under Rule 702 of the Federal Rules of Evidence and is hereby excluded."  Mot. in. Limine Proposed Order.

The court agrees that Dr. Meliopoulos has not presented credentials as a chemist or chemical engineer.  Had this case gone to trial, the court accordingly would have excluded his testimony to the effect that the material applied as a coating to the conduit is classified as a "semiconductor" rather than an insulator or insulating material.  Nevertheless, the court rules that this case presents no genuine dispute as to any material fact and considers the issue of whether the coating material may be described generally as an "insulator" or "insulating material" not to be an issue of material fact in

this case. Therefore, the court sees no need to resolve, as a disputed fact in this litigation, whether the coating material would be classified for chemical purposes as an "insulator" or instead classified as a "semiconductor."

The uncontested fact is that the coating material, *in the form in which it exists on the inside of the subject conduit*, has a measurable electrically-insulating property, as discussed previously in this Opinion. The parties also agree, as discussed previously in this Opinion, that while the coating provides some electrical resistivity, it does not do so in a way that would qualify the *conduit* as an insulator. While the court must make its decision on defendant's motion for summary judgment on the basis of evidence that would be admissible, Dr. Meliopoulos's opinion that the material is a "semiconductor" is irrelevant to the court's summary judgment analysis and is not used to reach the decision in this case.

For these reasons, plaintiff's motion in limine will be denied as moot.

## III. CONCLUSION

For the reasons stated above, the court concludes that there is no genuine dispute as to any material fact and rules that plaintiff has not demonstrated that "the government's classification is incorrect." *Jarvis Clark*, 733 F.2d at 876. Therefore, the defendant is entitled to judgment as a matter of law. Accordingly, the court will deny

plaintiff's motion for summary judgment, grant defendant's cross-motion, and enter summary judgment in favor of defendant.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: March 13, 2023
      New York, New York