Slip Op. 14-155

UNITED STATES COURT OF INTERNATIONAL TRADE

INFANTINO, LLC,

Plaintiff,

v.

UNITED STATES,

Defendant.

Before: Richard W. Goldberg, Senior Judge
Court No. 11-00497

**<u>OPINION</u>**

[Plaintiff's motion for summary judgment is granted; defendant's cross-motion for summary judgment is denied.]

Dated: December 24, 2014

*Mandy A. Edwards* and *S. Richard Shostak*, Stein Shostak Shostak Pollack & O'Hara, LLP, of Los Angeles, CA, for plaintiff.

*Beverly A. Farrell*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were *Stuart F. Delery*, Assistant Attorney General, and *Amy M. Rubin*, Acting Assistant Director, International Trade Field Office. Of counsel on the brief was *Sheryl A. French*, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of New York, NY.

Goldberg, Senior Judge: At issue is the proper classification of merchandise sold under the name Shop & Play® Funny Farmer ("Funny Farmer" or "merchandise")[1] and imported by Plaintiff Infantino, LLC ("Infantino"). Infantino and the United States (the "Government") have cross-moved for summary judgment. The Government argues that U.S. Customs and Border Protection ("Customs" or "CBP") correctly classified the merchandise under U.S. Harmonized Tariff Schedule ("HTSUS") subheading 9404.90.20. Infantino claims that the merchandise is

---

[1] The parties refer to the merchandise as the "Funny Farmer," though Infantino's catalogue refers to it as the "Funny Farm." *See* Def.'s Opp'n to Pl.'s Mot. for Summ. J. & Cross-Mot. for Summ. J. at Ex. B at 35, ECF No. 45. The court assumes that the parties have correctly identified the name of the product at issue and refers to the product as "Funny Farmer" throughout this opinion.

properly classifiable under HTSUS subheading 9503.00.00.  Merchandise under HTSUS subheading 9503.00.00 enters duty free, while merchandise under HTSUS 9404.90.20 carries a six percent *ad valorem* duty.  The court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (2012). As set forth below, the court grants Infantino's motion for summary judgment and denies the Government's cross-motion for summary judgment.

## BACKGROUND

The Funny Farmer is sold under the Shop & Play® brand as a "2-in-1 play mat" specially designed for use both as a normal play mat and inside of a shopping cart.  *See* Pl.'s Mot. for Summ. J. ("Pl.'s Br.") at Ex. 1, ECF No. 39; Def.'s Opp'n to Pl.'s Mot. for Summ. J. & Cross-Mot. for Summ. J. ("Def.'s Br.") at Ex. E at 2, ECF No. 45.  It measures approximately nineteen to twenty inches wide and forty-five inches long and is stuffed with a uniform, light polyester-fiber batting.  *See* Pl.'s Br. at Decl. of Wendy McLean ¶ 4 & Ex. 1.  One side of the Funny Farmer is a solid blue color, while the activity side depicts a farm theme and contains brightly colored graphics, five removable activity toys, and one sewn-in activity toy.  *Id.*  Some of the merchandise's features enable its shopping-cart use, such as a detachable waist belt, leg flaps, a crescent-shaped detachable bolster pillow decorated like a pea pod, small pockets designed as a "convenience add-on" for parents to store items, and Velcro that secures the mat to the shopping-cart seat.  Def.'s Br. at Ex. C ("Cosky Dep.") at 49:8; *see* Pl.'s Br. at Decl. of Wendy McLean ¶¶ 4–6 & Ex. 1.  The packaging for the Funny Farmer advertises the Funny Farmer's dual use as both the "perfect mat for tummy time play" and an in-cart mat that "turns any shopping cart into a clean, comfy activity center."  Pl.'s Br. at Ex. 1.

Infantino imported the Funny Farmer merchandise in question on February 3, 2008 at the Long Beach Seaport. Summons 1, ECF No. 1. The merchandise was assigned Entry Number 231-5466017-1 and entered under HTSUS subheading 9404.90.20. *Id.* at 2. That heading covers

> [m]attress supports; articles of bedding and similar furnishing (for example, mattresses, quilts, eiderdowns, cushions, pouffes and pillows) fitted with springs or stuffed or internally fitted with any material or of cellular rubber or plastics, whether or not covered.

CBP liquidated the entry without change on December 19, 2008. Def.'s Br. 2; Pl.'s Notice of Errata 1, ECF No. 50. Infantino subsequently filed Protest Number 2704-09-101681, claiming that the Funny Farmer is properly classified under HTSUS subheading 9503.00.0080, which pertains to

> [t]ricycles, scooters, pedal cards and similar wheeled toys; dolls' carriages; dolls, other toys; reduced-scale ("scale") models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof.

*See* Compl. ¶¶ 3, 6, ECF No. 5; Pl.'s Br. 3. Customs denied that protest, apparently without extensive analysis, on August 5, 2011. *See* Compl. ¶ 3. The propriety of Customs' protest denial is the subject of the instant action. Infantino claims that the denial is in error, reasserting that the Funny Farmer must be classified under subheading 9503.00.00. The Government claims that the protest was properly denied, because the original 9404.90.20 subheading was correct.

Although the protest denial in this case was executed summarily, Customs earlier issued a more detailed ruling that classified identical or nearly identical merchandise imported by Infantino. *See* Def.'s Br. at Ex. F ("HQ H031397"). The issue in HQ H031397 was the same: whether the merchandise had been properly classified under HTSUS heading 9404 or should have been classified, per Infantino's protest, under 9503. *Id.* at 2. In order to decide whether 9503 was the proper heading, Customs analyzed whether the primary purpose of the merchandise

was "to amuse or to provide a utilitarian/functional quality." *Id.* at 3. To that end, Customs considered several of the analytical factors set forth in *United States v. Carborundum Co.*, 63 CCPA 98, 102, 536 F.2d 373, 377 (1976). Specifically, Customs considered "(1) the general physical characteristics of the merchandise; (2) the expectation of the ultimate purchasers; (3) the channels, class or kind of trade in which the merchandise moves; (4) the environment of the sale . . . ; [and] (5) usage, if any, in the same manner as merchandise" principally designed for amusement. HQ H031397 at 3. Customs ultimately determined that, though the Funny Farmer "has some amusing features incorporated into the design, this is outweighed by the utilitarian design and purpose of the article which is intended to provide for the safety and comfort of infants while in a shopping cart." *Id.* at 4. Thus, Customs denied Infantino's protest and upheld the Funny Farmer's classification under heading 9404. *Id.* at 5.

## STANDARD OF REVIEW

In the context of a protest denial, the court reviews CBP's findings of fact and conclusions of law *de novo*. *See* 28 U.S.C. §§ 2639(a)(1), 2640(a); *Tyco Fire Prods. L.P. v. United States*, 37 CIT __, __, 918 F. Supp. 2d 1334, 1339 (2013). The court arrives at the proper classification by first determining the meaning of the relevant tariff provisions (a question of law) and then deciding under which of the properly construed tariff provisions the merchandise at issue falls (a question of fact). *See Bausch & Lomb, Inc. v. United States*, 148 F.3d 1363, 1365–66 (Fed. Cir. 1998). Though the court accords "respect" to CBP's classification rulings "proportional to [their] 'power to persuade,'" *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)), the court has "an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms," *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005).

Summary judgment is appropriate if, viewing the evidence in a light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  USCIT R. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In a classification case, this means that summary judgment is appropriate when "there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is."  *Bausch & Lomb*, 148 F.3d at 1365.

### DISCUSSION

The court now considers Infantino's and the Government's claims and holds that the Funny Farmer is properly classified as a toy under subheading 9503.00.00.  The rationale for this holding must be prefaced with a brief explanation of the import-classification process.

Import classifications are governed by the General Rules of Interpretation ("GRIs") of the HTSUS and any applicable Additional United States Rules of Interpretation.  *See Dependable Packaging Solutions, Inc. v. United States*, 757 F.3d 1374, 1377 (Fed. Cir. 2014).  The GRIs are applied in numerical order.  *Id.*  Accordingly, the court's analysis begins with GRI 1, which provides that "classification shall be determined according to the terms of the [HTSUS chapter] headings and any relative section or chapter notes."  *Id.* at 1377–78.[2]  In evaluating whether subject merchandise fits within a particular heading, the court generally construes HTSUS terms "'according to their common and commercial meanings, which are presumed to be the same.'"  *Id.* at 1378 (quoting *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999)).  In its analysis, the court may also consult the World Customs Organization's "Explanatory Notes,"

---

[2] The HTSUS is composed of a total of ninety-nine chapters, which are distributed among twenty-two sections.  Each chapter contains headings that are further divided into subheadings.  "The headings contain 'general categories of merchandise,' whereas 'the subheadings provide a more particularized segregation of the goods within each category.'"  *Deckers Outdoor Corp. v. United States*, 714 F.3d 1363, 1366 (Fed. Cir. 2013) (quoting *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1439 (Fed. Cir. 1998)).  In applying GRI 1, the subheadings are not to be consulted until it is determined that the merchandise in question is classifiable under a particular heading.  *Dependable Packaging*, 757 F.3d at 1377–78.

which, though not legally binding, are "generally indicative of the proper interpretation of the various HTSUS provisions." *Kahrs Int'l, Inc. v. United States*, 713 F.3d 640, 644–45 (Fed. Cir. 2013). If, consulting these sources, "the proper heading can be determined under GRI 1, the court is not to look to the subsequent GRIs." *Dependable Packaging*, 757 F.3d at 1378.

If, however, the proper heading cannot be determined under GRI 1 because the merchandise is *prima facie* classifiable under two or more headings, the court moves to GRI 3. GRI 3(a) provides that, in such a case, "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description." In cases when GRI 3(a) is unavailing, GRI 3(b) offers guidance for composite goods. Under GRI 3(b), composite goods "shall be classified as if they consisted of the material or component which gives them their essential character." *See, e.g.*, *Alcan Food Packaging (Shelbyville) v. United States*, 771 F.3d 1364 (2014).

Infantino and the Government each claim that the Funny Farmer is *prima facie* classifiable only under their respective proposed headings, and not under the other's heading, such that this case is properly resolved under GRI 1. Infantino alternatively claims that the Funny Farmer is *prima facie* classifiable under both heading 9404 and 9503, and that heading 9503 is the more specific of the two, rendering it victorious under GRI 3(a). As to Infantino's alternative claim, the Government rebuts that heading 9404 is appropriate because it is the only heading to "wholly" describe the Funny Farmer.

In its *de novo* review, the court agrees with Infantino's alternative claim—but only in part. Although some parts of the Funny Farmer fall within heading 9404 and others within 9503—such that the good falls *prima facie* within both headings—neither heading wholly describes all parts of the Funny Farmer. That is, each heading describes "part only" of the Funny

Farmer.  GRI 3(a).  In such a situation, the proper GRI to apply is GRI 3(b) for composite goods.

Under GRI 3(b), the court holds that the Funny Farmer's essential character is imparted by its

toy components, which are classifiable under HTSUS heading 9503.  Accordingly, the entire

good is classifiable as such.

I.        **The Merchandise Is *Prima Facie* Classifiable Under HTSUS Heading 9404**

The court first holds that the merchandise is *prima facie* classifiable under

HTSUS heading 9404.  As previously noted, heading 9404 covers "articles of bedding and

similar furnishing (for example, mattresses, quilts, eiderdowns, cushions, pouffes and pillows)

fitted with springs or stuffed or internally fitted with any material."  The Explanatory Notes

define "any material" to include "cotton, wool, horsehair, down, synthetic fibres, etc."

Explanatory Note ("EN") 94.04.  The body and pillow of the Funny Farmer is stuffed with 100%

polyester-fiber filling and is a quilt, cushion, or similar item.  HTSUS 9404.  Thus, the court

agrees with the Government that the Funny Farmer is *prima facie* classifiable under HTSUS

heading 9404.

Infantino disagrees with this classification, but does not directly address the plain

language of HTSUS heading 9404.  Pl.'s Reply to Gov't's Opp. to Pl.'s Mot. for Summ. J.

("Pl.'s Reply Br.") 12–13, ECF No. 49.  Instead, Infantino merely attempts to distinguish a

case—*Bauerhin Technologies Ltd. Partnership v. United States*, 110 F.3d 774 (Fed. Cir. 1997)—

that the Government cited as an analogue favoring its preferred classification.  In *Bauerhin*, the

Federal Circuit found that certain cushioned inserts "imported in the shape and form of" the baby

car seats into which they were to be inserted were "cushions" within the meaning of HTSUS

9404.  *Id.* at 775, 779–80.  In so holding, the court rejected the plaintiff's argument that HTSUS

heading 9404 was limited to items whose primary purpose is to facilitate sleeping or napping. *Id.* at 776–778.

Infantino points out a number of physical differences between the Funny Farmer and the cushioned seat inserts at issue in *Bauerhin*, for example that Funny Farmer does not form-fit its receptacle shopping cart. But these differences are not the issue: The important point from *Bauerhin* is that heading 9404 can cover non-sleep-purposed cushioning, like the Funny Farmer in both its play-mat and shopping-cart configurations. *Id.* The Funny Farmer certainly qualifies as cushioning, insofar as it is stuffed with a polyester-fiber filling and is designed to cushion a child in either of its configurations. It is thus *prima facie* covered under HTSUS heading 9404, and Infantino's effort to distinguish *Bauerhin* is inapposite.

## II.     The Merchandise Is *Prima Facie* Classifiable Under HTSUS Heading 9503

The court's inquiry does not end upon concluding that the Funny Farmer is *prima facie* classifiable under HTSUS heading 9404. The court must next consider whether the Funny Farmer is also classifiable under HTSUS heading 9503, which, *inter alia*, covers "other toys."[3] There being no HTSUS definition of the term "toys," this court has determined a toy to be "an object primarily designed and used for pleasurable diversion," as opposed to practicality or utility. *Springs Creative Prods. Grp. v. United States*, Slip Op. 13-107, 2013 WL 4307857, at *8

---

[3] The Government argues that the court should decline to undertake its own HTSUS heading 9503 inquiry because CBP already decided the matter in HQ H031397, and that ruling deserves *Skidmore* deference. Def.'s Br. 14–15. The court disagrees. In *Mead*, the Supreme Court held that courts may accord *Skidmore* deference to a particular CBP ruling based on its "thoroughness, logic and expertness, its fit with prior interpretations, and any other sources of weight." 533 U.S. at 235; *see also Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1354 (Fed. Cir. 2003). In HQ H031397, CBP did not arrive at its ruling following a "'deliberative notice-and-comment . . . process,'" which is "an important factor [in] attributing *Skidmore* deference to a particular classification ruling." *Structural Ind., Inc. v. United States*, 356 F.3d 1366, 1370 (Fed. Cir. 2004) (quoting *Rubie's*, 337 F.3d at 1356). Moreover, CBP's ruling is not reflective of a consistent pattern in classifying similar imports. *See id.* at 1370–71 (declining to afford *Skidmore* deference, in part, because no consistent pattern of rulings existed). As the Federal Circuit has noted, "[a] single ruling standing alone has very limited value." *Id.* at 1371. Finally, CBP's analysis in HQ H031397 is not particularly persuasive because it focuses heavily on the utilitarian features of the Funny Farmer while only summarily considering the product's countervailing amusing features.

& n.4 (CIT Aug. 16, 2013).[4]  The court holds that the Funny Farmer is *prima facie* classifiable under HTSUS heading 9503, because it was designed for and is used for pleasurable diversion.

Three aspects of the Funny Farmer render it *prima facie* classifiable as a toy: (1) the way that Infantino trademarked and tested the Funny Farmer, (2) its product positioning,[5] and (3) its physical characteristics.  First, Infantino trademarked and tested the Funny Farmer as a toy.  The trademark for the entire Shop & Play® line is associated with International Class 28, Pl.'s Br. at Ex. 11, which is in turn defined to include "[g]ames and playthings"  *see* 37 C.F.R. § 6.1 (2014).  And Infantino also designed and tested the Funny Farmer so that it would comply with U.S. and British toy standards.  Specifically, at Infantino's behest, SGS Hong Kong Ltd. and Bureau Veritas Consumer Products Services UK Ltd. tested the Funny Farmer for compliance with an internationally recognized toy standard published by ASTM International and a mandatory European toy standard published by the British Standards Institution.  *See* Pl.'s Br. at Decl. of Wicky Lee ¶¶ 3–4 & Exs. 14–16.

Infantino's positioning of the Funny Farmer also indicates that the Funny Farmer is *prima facie* classifiable as a toy.  In positioning the Funny Farmer—and all other themed two-in-one play mats sold under the Shop & Play® line—Infantino underscored the product's "uniqueness" as an "activity center that moms could use for their babies at home and then take with them into an actual shopping environment" so that children could be "surrounded by their toys and be entertained."  Cosky Dep. 27:10–24.

---

[4] The *Springs Creative* court observed its duty to accord undefined terms their common and commercial meanings by consulting dictionaries to reach the common meaning of "toy" quoted in the text.  The court also found that this definition was consistent with judicial interpretation and the HTSUS Explanatory Note 95.03(D) defining other toys, in part, as "toys intended essentially for the amusement of persons (children or adults)."  2013 WL 4307857, at *7–8.

[5] "Product positioning" refers to a company's intended purpose for a product, as consistently communicated across a variety of media platforms.  *See* Cosky Dep. 25:22–26:14.

This positioning is evident from the Funny Farmer's catalogue placement and also its packaging. Infantino included the Funny Farmer in its "2007 Toys & Activity Play" catalogue. Def.'s Br. at Ex. B. In that catalogue, Infantino separated at least a portion of its products into various tabs labeled "Pegged Toys," "Boxed Toys," "Gyms & Playmats," "Puzzles," and "Shopping Cart Covers." *Id.* The Shop & Play® line in the Funny Farmer theme appeared under the "Shopping Cart Covers" tabs alongside other activity-themed shopping-cart inserts sold under different product line names (Shop & Dine®, CartSafari™, CartTunes™). Though the catalogue's description of the Shop & Play® line emphasizes its utilitarian features (including that the product is easy to clean, is protected by a material that inhibits the growth of bacteria, contains storage pockets, and offers a back rest and soft padding), the description and accompanying photograph also prominently portray the accompanying "plush pals." *Id.* Furthermore, though Infantino does not refer to its Shop & Play® line as "toys" like other items in the catalogue, the catalogue itself is called a "Toys and Activity Play" catalogue and does not feature Infantino's purely utilitarian travel products. *See id.*[6] Thus, Infantino's placement of the Funny Farmer in the Toys and Activity Play catalogue suggests that the product is a toy.

So does the packaging of the Funny Farmer itself. The packaging displays the Shop & Play® brand name on all sides of the box. The front, back, and side of the packaging describes the Funny Farmer as a "2-in-1 play mat [that] turns any shopping cart into a clean, comfy activity center." Pl.'s Br. at Ex. 1. The front of the package also contains three different-sized photographs. The largest photograph depicts a smiling baby seated in a shopping cart covered by

---

[6] A screenshot of Infantino's website from July 16, 2008 shows that Infantino separated products on its website into "Toys," "Carriers," "Soft Travel," "Shopping Cart Covers," and "Puzzles." Def.'s Br. at Ex. D. The Funny Farmer was featured under the "Shopping Cart Covers" tab and not the "Toys" tab. Similarly, when Infantino marketed its products at trade shows, Infantino separately featured the Shop & Play® line instead of visually grouping the Shop & Play® products with its "Toys." Pl.'s Br. at Exs. 7–8. But that the product was not advertised as a pure "toy" does not preclude classification under HTSUS 9503. *See Springs Creative*, 2013 WL 4307857, at *9. Indeed, Infantino does not contend that the Funny Farmer is a toy in its entirety.

the Funny Farmer, with the Funny Farmer's toys dangling outside the cart. *See id.* Infantino

purposely positioned the toys outside the cart "to highlight them," even though the toys usually

dangle inside the cart in front of the child. *See id.* at Decl. of Wendy McLean ¶ 13. A second

picture depicts a different angle of a child playing inside a shopping cart fitted with the Funny

Farmer while the storage pockets are visible. Lastly, the smallest of the photographs depicts the

Funny Farmer laid flat along with the description, "The perfect mat for tummy time play!"

The back cover of the packaging contains a more thorough description of the Shop &

Play® product line that emphasizes the product's toy-like aspects in both its mat and cart-insert

configurations. Specifically, the packaging provides,

> Gone shopping? **Shop & Play™** can make your errands more rewarding for baby and more relaxing for you. **At home** Shop & Play™ spreads out to surround baby with a world of fun things to discover. **At the store**, its padded, wraparound design **transforms any shopping cart** into a **clean**, **secure** and **comfortable activity center** for baby to keep on playing and learning.

Pl.'s Br. at Ex. 1 (emphasis in original, in the form of words offset in different font colors). The

back cover also contains a picture of the Funny Farmer laid flat with arrows pointing to and

describing, *inter alia*, "[r]oomy storage pockets," protective leg flaps, a "cozy headrest for

baby," and "[f]ive removable toys that rattle, crinkle and squeak!" *Id.*

Collectively, the packaging supports classification as a toy. The court acknowledges that

the packaging extols the utilitarian features of the Funny Farmer when used in a shopping cart.

But Infantino's emphasis on the Funny Farmer's shopping cart use was not intended to downplay

the product's additional use as a traditional play mat. Rather, Infantino chose to highlight Funny

Farmer's more novel use instead of its familiar use. *See* Pl.'s Br. at Decl. of Wendy McLean ¶

12. Furthermore, and most importantly, the *uniform* theme throughout the packaging is not the

product's ability to keep a child comfortable, clean, or secure in a cart; it is that the product is

uniquely situated to keep children entertained both at home and on-the-go. While only a portion of the good's packaging emphasizes the Funny Farmer's shopping-cart use, the entirety of the packaging highlights the Funny Farmer's amusing activity elements (which do not vary based on use in a cart or on the floor).

Finally, the Funny Farmer's physical characteristics support *prima facie* classification as a toy. An examination of the Funny Farmer confirms that it is a "configured shopping cart seat cover or insert" that is visually similar to a traditional play mat and that has been "specifically adapted to be reconfigured into a play mat for an infant or toddler." *Compare* Pl.'s Br. at Ex. 1, *with* Def.'s Br. at Ex. E at 2. But regardless of whether the Funny Farmer is used in a shopping cart or on the floor, the item contains many features that are obviously amusing to small children. *See* Pl.'s Br. at Ex. 1.[7] The activity side of the Funny Farmer displays multiple bright colors and is farm-themed, consisting of graphics of food items (such as watermelon slices, eggs, cheese, peas, carrots, and strawberries), barnyard animals (such as rabbits, cows, chickens, and pigs), and farmers (both male and female, wearing overalls and straw hats). *See id.* There are also several removable cloth toys attached to the Funny Farmer. *See id.*; Def.'s Br. 4 (referring to the items as toys). These toys dangle in front of the child when seated in a shopping cart and lie flat on the ground when used as a play mat.

Three of the toys make crinkling sounds when squeezed—(1) a stuffed red tomato; (2) a fabric square that contains a drawing of a cow along with the word "moo!" on one side and a cheese wedge on the other side; and (3) a fabric square that contains a drawing of a chicken

---

[7] The court need not address the parties' arguments related to the admissibility of a publication by the U.S. Consumer Products Safety Commission ("CPSC") (appended to Infantino's moving brief as Exhibit 13) identifying various toy characteristics that are amusing to young children. The Government does not seriously dispute that portions of the Funny Farmer are stimulating and amusing to young children and indeed refers to the items attached to the mat as "toys" in its briefing. *See* Def.'s Br. 4. The amusement/play value of the Funny Farmer is apparent from a simple physical examination of the merchandise, and reliance on the CPSC document is unnecessary.

along with the words "cluck cluck!" on one side and a cooked egg on the other side. Another toy, a stuffed cloth milk "carton," rattles when shaken. Lastly, there is a "book" that opens to a graphic of a smiling baby along with the phrase "I see you" on one side and a mirror on the other. The front cover of the "book" contains graphics of a female and male farmer along with the words "funny farmers!" and the back cover contains a graphic of a smiling baby waving along with the words "bye-bye!" The Funny Farmer also features one sewn-in toy, a cloth basket, that sits upright on the shopping-cart handle when the Funny Farmer is used in a cart. The basket is intended to allow children to mimic the actions of their parent in a shopping cart by moving the detachable toys (the tomato, the milk carton, etc.) in and out of the basket. *See* Pl.'s Br. at Decl. of Wendy McLean ¶ 5 & Ex. 1.

Though the Funny Farmer offers much amusement value, the product also serves a utilitarian purpose as a shopping-cart insert and contains features exclusively geared towards that use. For instance, the Funny Farmer contains leg flaps that may be secured by Velcro when used solely as a play mat. *See id.* at Decl. of Wendy McLean ¶ 10 & Ex. 1; Def.'s Br. at 3–4. The Funny Farmer also has a removable waist belt that secures a child inside a shopping cart and pockets intended to store items for parents while shopping. *See* Def.'s Br. at 3–4. Lastly, the Funny Farmer contains a removable, decorative bolster pillow that supports a child's back when used in a shopping cart (and that serves to prop up a child engaged in tummy-time play). *Id.*

Even so, many goods that have been classified as toys had *some* utilitarian value: for instance, traditional play mats, inflatable floats, and play tents. *See Ero Indus. v. United States*, 24 CIT 1175, 1180–84, 118 F. Supp. 2d 1356, 1360–63 (2000) (classifying play tent with licensed graphics of children's characters as a toy even though it provided some utility as a tented play structure); *Ideal Toy Corp. v. United States*, 78 Cust. Ct. 28, 34, C.D. 4688 (1977)

(upholding classification of a brightly-colored, themed inflatable float as a toy); Pl.'s Br. at Ex. 12 (compiling CBP rulings classifying play mats and play gyms as toys); *see also Springs Creative*, 2013 WL 4307857, at *9 (classifying a craft blanket kit as a toy notwithstanding its utilitarian value as a blanket). While the court acknowledges that the Funny Farmer has more utilitarian value than a pure play mat, it also lacks certain features detracting from its overall utility as a shopping-cart insert. For instance, the Funny Farmer does not contain additional padding where the child sits or near areas of the cart with which the child would come into contact, thus detracting from the product's use for comfort. *See* Pl.'s Br. 7–8 & Ex. 1. The Funny Farmer also does not cover the sides of the cart, thus reducing the overall utility of the product in keeping the child clean and germ-free. *Id.* Furthermore, the Funny Farmer is not a particularly useful means of safely securing a child in a shopping cart, as the waist belt "is not intended to prevent children from standing up in or climbing/falling out of a shopping cart." Pl.'s Br. at Ex. 1; *see also Ideal Toy*, 78 Cust. Ct. at 34 (finding that, given the play float's possibility of overturning, the prime motivation of a parent purchasing a play float is to amuse the child and not to offer safe support in water). Lastly, the Funny Farmer cannot even be used in a shopping cart until a child can sit upright and has value only as a play mat for the first months of a child's life. *See* Pl.'s Br. at Decl. of Wendy McLean ¶ 16. As such, the Funny Farmer's utilitarian value cannot be said to outweigh its amusement value, and the product is *prima facie* classifiable as a toy.

III.    **Those Portions of the Funny Farmer that Impart the Product's "Essential Character" Are Classifiable under HTSUS Heading 9503**

Having concluded that the Funny Farmer is *prima facie* classifiable under two headings (HTSUS headings 9404 and 9503), the court must next apply GRI 3. Although GRI 3(a) would normally provide for the Funny Farmer to be classified under the heading that "provides the most

specific description," that provision does not apply "when two or more headings each refer to part only of the materials or substances contained in mixed or composite goods." In such a circumstance, GRI 3(b) applies instead, and provides that the goods at issue "shall be classified as if they consisted of the material or component which gives them their essential character." *See, e.g.*, *Alcan Food Packaging*, 771 F.3d at 1364.

The court holds that neither HTSUS heading 9404 nor heading 9503 describe the Funny Farmer in full, and that the portions of the Funny Farmer that impart it with its "essential character" are properly classified under HTSUS heading 9503. First, heading 9404 cannot fully describe the Funny Farmer. That heading covers articles of bedding and the like; it clearly would not cover, for example, the plush toys that can be detached from the Funny Farmer.[8] As for heading 9503, no party disputes that it describes the Funny Farmer only in part. *See* Pl.'s Reply Br. 13–14. Its detachable seatbelt and backside storage pockets, which serve no amusement purpose at all but are strictly utilitarian, make this clear. Def.'s Br. 18–19. Therefore, both heading 9404 and heading 9503 describe only part of the Funny Farmer.

This being the case, the court's mandate under GRI 3(b) is to decide which of the two headings covers those parts of the Funny Farmer that impart it with its "essential character." This decision is informed by the Explanatory Note to GRI 3(b):

> The factor which determines essential character will vary as between different kinds of goods. It may, for example, be determined by the nature of the material

---

[8] Because the court holds that HTSUS heading 9404 does not "wholly" cover the Funny Farmer, it need not address those of the Government's arguments premised on the notion that heading 9404 is the *only* heading to wholly cover the product. *See* Def.'s Br. 18–19. The Government does not directly explain why it believes heading 9404 wholly covers the Funny Farmer: Rather, the Government simply claims that the Funny Farmer is *prima facie* classifiable under 9404 despite its attached toys and the like, and then asserts that the product is wholly covered by 9404. *See id.* at 17–19. But, in order for GRIs 1 and 3 to make any sense, *prima facie* and whole coverage must be discrete concepts. Otherwise, any product *prima facie* classifiable under at least one tariff heading pursuant to GRI 1 would be immune from composite classification under GRI 3(b). That would render GRI 3(b) incapable of fulfilling its purpose: to act as a tiebreaker when a good is *prima facie* classifiable under more than one tariff heading.

or component, its bulk, quantity, weight or value, or by the role of a constituent
material in relation to the use of the good.

This note suggests that a close examination of the Funny Farmer itself is most helpful in

determining which of its constituent parts imparts its essential character. *See also Simod Am.*

*Corp. v. United States*, 872 F.2d 1572, 1578 ("[T]he merchandise itself is often a potent witness

in classification cases.")

Upon such an examination, the court holds that the Funny Farmer's essential character is

imparted by its toy components. First, per the Explanatory Note, the "bulk" of the Funny

Farmer's components are classifiable under 9503: The detachable toys are toys by their own

terms, and the play mat would be classifiable as a toy were it not convertible into a cart insert.

*See* Pl.'s Br. at Ex. 12 (compiling CBP rulings classifying play mats and play gyms as toys); *see*

*also Springs Creative*, 2013 WL 4307857, at *9 (classifying a craft blanket kit as a toy

notwithstanding its utilitarian value as a blanket). The fact that most of the items that make up

the Funny Farmer are toys suggests that the entire good is a toy.

Second, the Funny Farmer's packaging and pricing suggest that it is a toy. The

packaging, as already noted, uniformly touts the Funny Farmer's benefits as a toy. Pl.'s Br. at

Decl. of Wendy McLean ¶ 13 & Ex. 1. By so doing, the packaging suggests that the Funny

Farmer is essentially a toy, and that its cart-insert function is an auxiliary use. Similarly, the

Funny Farmer is priced the same as Infantino's other play mats (which, as discussed, would be

classified as toys). *See id.* at Decl. of Wendy McLean ¶ 20 & Ex. 2. This too indicates that the

Funny Farmer is a toy with cart-insert features. Thus, because the Funny Farmer's packaging

and pricing suggest that it is a toy, and also because the bulk of the product's components would

be so classifiable, the court holds that entire good is classifiable under heading 9503.

## **CONCLUSION**

Because the Funny Farmer is classifiable as a toy under HTSUS 9503.00.00, Customs incorrectly liquidated the entries associated with Protest No. 2704-09-101681 at a six percent *ad valorem* duty rate under HTSUS 9404.90.20.  Accordingly, for reasons discussed above, Infantino's motion for summary judgment is granted and the Government's cross-motion for summary judgment is denied.  Judgment will enter accordingly.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated:  December 24, 2014
New York, New York